## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA

Case No. 1:23-cr-20153-KMM

UNITED STATES OF AMERICA,

      Plaintiff,

v.

OTHONIEL GOMEZ,

      Defendant.

_____/

## REPORT AND RECOMMENDATIONS ON
## DEFENDANT'S MOTION FOR NEW TRIAL

**THIS CAUSE** is before the Court on Defendant's Motion for New Trial Based Upon an Intentional Violation of the Jencks Act and *Brady*, and Motion to Compel. (ECF No. 189).[1] Defendant Othoniel Gomez moves for a new trial, premised on the Government's failure to turn over text messages between the Government's case agent and its undercover agent, who testified at trial. Defendant Gomez argues that the Government's failure to produce the text messages at trial violated his rights under the Jencks Act and, because the messages would have impeached the agent, also violated *Brady v. Maryland*.[2] The Government filed a Response (ECF No. 193), to which Defendant filed a Reply (ECF No. 197). The Court convened an evidentiary hearing on the Motion on May 2, 2024. Having reviewed the Motion, Response, Reply, the supporting materials attached thereto, evidence and argument advanced at the hearing, the record, and being otherwise fully advised, the undersigned respectfully **RECOMMENDS** that the Motion for New Trial be **DENIED**.

---

[1] This matter has been referred by the Honorable K. Michael Moore, United States District Judge, pursuant to 28 U.S.C. § 636(b) and the Magistrate Judge Rules of the Local Rules of the Southern District of Florida, to take all necessary and proper action as required by law with respect to the Motion.  (ECF No. 190).

[2] *Brady v. Maryland*, 373 U.S. 83, 84 (1963).

## I.      BACKGROUND

### A.      Factual Background

Defendant was charged with Conspiracy to Engage in Money Laundering between March 1, 2022 and May 23, 2023, along with co-conspirators Jesus Javier Diaz, Yunier Cardenas Callero, and Carlos Alberto Morrilla (Count I); and 5 counts of money laundering (Counts 11–15). (ECF No. 5). In broad strokes, this case arises from an IRS operation to catch would-be money launderers. Codefendant Jesus Javier Diaz was approached by a confidential informant ("CI") who offered him the opportunity to launder money for a drug trafficking cartel. Diaz coordinated a series of recorded meetings between the CI and his "boss"—the undercover agent—and those codefendants recruited by Diaz. Diaz pled guilty and cooperated with the Government; Defendant exercised his right to proceed to trial. The factual summary that follows is drawn from the evidence adduced at trial.

### B.      Summary of Trial Proceedings

At trial, the Government presented eight witnesses, four of whom were: codefendant Jesus Javier Diaz; the confidential informant, Efrain Murillo (the "CI"); IRS Special Agent Robert Munoz; and the Undercover Agent, Special Agent Marisa Sandoval (the "UC" or "Sandoval"). (ECF Nos. 114, 115, 118). Defendant called three witnesses, but did not testify himself (ECF No. 122).

Defendant's involvement in the investigation began in June 2022. Defendant was introduced to the CI by Diaz, and met him in person on June 29, 2022. At a recorded meeting, the CI told Defendant that his "client" had to move money; the CI proposed giving cash to Defendant in exchange for cashier's checks. (ECF No. 217-6 at 19, 21). The CI offered to pay Defendant a percentage of the laundered funds for this service. (*Id.* at 20). Defendant told the CI that he had

never done this before, but assured him that he was in the banking business, and he could do it. (*Id.*). He demanded a ten percent fee for his services. (*Id.* at 21).

After the meeting, the CI pursued Defendant in several text messages and they ultimately spoke on the phone. Defendant would later say that he felt the CI discussed too many details of their business over the phone. They met in person on July 7, 2022; that meeting too was recorded. (ECF No. 217-8). Defendant told the CI he would rather not go forward, explaining again that he had never done this before and he did not feel right. He told the CI that he made that decision the day the CI called him, explaining that he does not like such conversations to occur on the phone.

The CI called Diaz and complained about having wasted his time on a dead end. The CI told Diaz "[i]n my business, which I know is your business too, the business world, if you cant' keep your word . . . nothing could happen," (ECF No. 217-10 at 3); "fine, he's a loser . . . I'll look, I will get even with him. Because I always get even," (*id.* at 4); "now I know why his wife left him . . . . can you get me his wife's information? I will get it. Try to get it for me because I'm going to get even," (*id.*); "that's the thing, now I disclosed information with . . . [him] and now . . . [he] knows about all this . . . information out there and he's not working with me," (*id.* at 6). Though Diaz spoke to Defendant that day, at trial he denied that he recounted the CI's message to him. The CI never contacted Defendant again.

In August, co-defendant Diaz met with Sandoval and discussed possible leads—that is, other potential participants in their scheme to launder the UC's purported drug proceeds. During this recorded meeting, Diaz and Sandoval discussed two other potential recruits: a man from Argentina, and the "casino guy." Sandoval testified at trial that her intention going into this meeting was to hone in on these two targets. Sandoval testified that she "had no idea" who Defendant was

before this meeting with Diaz (ECF No. 217-36 at 31:25–32:3)[3]; *see also* (*id.* at 44:25–45:4) ("At the August meeting, I did not know him. But, after that, I did."). In the course of their discussion, Sandoval claimed that her client wanted to invest his money in the United States; Diaz suggested that Defendant—without mentioning his name—would be a good candidate. To that end, Diaz advised that the client who did not like the CI deals in real estate and has his own closing company. (ECF No. 217-13 at 25). Diaz offered to check with Defendant to see if he would be willing to work with someone other than the CI, and he would let Sandoval know if Defendant agreed. (*Id.* at 27).

Approximately two months later, in mid-October, Defendant met Sandoval and Diaz during an in-person recorded meeting. There, Defendant reiterated why he did not want to work with the CI, stating that the CI did not give him "any peace. He even talks too much. I don't talk those things . . . on the phone." (ECF No. 217-14 at 27). He proposed plans he devised for coordinating wire transactions through bank accounts held by Cuban nationals subject to deportation. Defendant and Sandoval negotiated the commission to be made on wires (between eight and nine percent) and cash (ten percent). Throughout the conversation, Defendant insisted that nothing come back to him, and he expressed his desire to sleep peacefully.

In mid-December, Diaz and Sandoval exchanged messages to coordinate Defendant's first transaction.[4]  Sandoval confirmed that the transaction would entail wiring $100,000.00 of cash at ten percent commission. (ECF No. 129-1 at 130). Sandoval and Diaz also discussed the instructions for Defendant to pick up the cash from Sandoval's associate. (*Id.* at 131). On December 14, 2022, Diaz confirmed that Defendant had picked up the cash from Sandoval's

---

[3] Citations to trial transcripts included herein shall reflect the transcript's original pagination, as opposed to the pagination assigned by the Court's electronic filing system.
[4] Sandoval's messages with Diaz were admitted as trial exhibit 4.  (ECF No. 129-1 at 105). She did not communicate directly with Gomez, other than the in-person meetings, which were recorded.

associate and that the wire would be completed on the following day, due to bank closure. (*Id.* at 135). When Sandoval requested an update from Diaz on December 15, Diaz advised her that Defendant told him his father had a stroke and is in the hospital. (*Id.* at 136). Sandoval responded to Diaz that she expected the wire by the following day and she expected Defendant to follow through on his promise. (*Id.*). The following day, on December 16, Diaz advised Sandoval that Defendant was sending wires from multiple accounts, and sent screenshots of confirmations for both wire transactions: the first transaction had a wire amount of $43,500.00; the second transaction had a wire amount of $46,500.00. (ECF No. 129-1 at 136–39). These transactions would form the bases for Counts 11 and 12 of the Superseding Indictment. *See* (ECF No. 5). On December 21, 2022, Sandoval advised Diaz that both transactions cleared. (ECF No. 129-1 at 140).

Diaz and Sandoval reconnected on January 5, 2023, in a WhatsApp exchange to coordinate a meeting for January 11. (ECF No. 129-1 at 140). Sandoval testified that Defendant requested this meeting because he was upset with the delay in confirming that the wires cleared. (ECF No. 217-36 at 9:3–9). Sandoval also advised Diaz that she had "around 100" for the "new guy,"[5] and coordinated for their upcoming meeting.

On January 11, 2023, Sandoval met with Diaz and Defendant in a recorded meeting. During the meeting, Defendant expressed his dissatisfaction with how the prior transaction took place. (ECF No. 217-15 at 3–4). Defendant proposed that he initiate the wire transfer first, and then take the cash. Defendant also proposed laundering the money through real estate. When Defendant asked if Sandoval and Diaz are ready for another transaction, Sandoval advised that she had the cash with her at the meeting. Defendant refused to take the cash, instead saying he would collect it from Sandoval later, after confirming with the bank account holder. Later, Sandoval and Diaz

---

[5] In her communications with Diaz, Sandoval referred to Defendant as the "new guy." (ECF No. 217-36 at 13:1–2).

coordinated a meeting with the "new guy" again via WhatsApp. (ECF No. 129-1 at 143). In a recorded meeting that same day, Defendant collected the cash from Sandoval, and she told him not to be nervous. (ECF No. 217-15 at 47); (ECF No. 217-36 at 45:3–7). On January 13, 2023, Diaz forwarded Sandoval three photos representing three wires at $30,000.00 each.  (ECF No. 129-1 at 144–47). These three wires would form the bases for Counts 13 through 15. (ECF No. 5 at 5).

On March 1, 2023, Sandoval wrote to Diaz requesting if their "new guy" can help wire $200,000.00 to an Arizona account. (ECF No. 129-1 at 148–49). Sandoval and Diaz exchanged messages over several days while Diaz awaited confirmation from Defendant. Finally on March 7, Diaz advised Sandoval that Defendant would pass on this transaction. (*Id.* at 151). The following day, Diaz offered to set Sandoval up with somebody else who can handle the wire. Sandoval and Diaz proceeded with the transactions with the other individual, later identified as codefendant Carlos Morilla. (*Id.* at 152–56).    On April 20, 2023, Sandoval offered Diaz another transaction for Defendant and Morilla. (*Id.* at 160). After three days, Diaz responded that Defendant would not participate in the transaction. (*Id.* at 163).

Through cross-examination of the CI, Defendant attempted to elicit evidence that would support his theory that the CI was skimming money off the operation for his own profit.  (ECF No. 217-37 at 21:1-9). Following Defendant's cross-examination of the CI, the Government called the case agent, IRS Special Agent Roberto Munoz, and elicited testimony to refute the accusation that the CI took money out of the operation.

Defendant presented an entrapment defense. Pretrial, the Government moved *in limine* to preclude him from prematurely arguing entrapment without first establishing it through evidence. In response, Defendant explained his entrapment defense: "the Government presented MR.

GOMEZ with opportunity plus.[6] Both the UC and the CI appealed to a non-criminal motive, specifically, providing MR. GOMEZ with real estate business. When the non-criminal motive did not work both the UC and the CI used excessive pressure." (ECF No. 93 at 13). Defendant argued that the CI's threats left him with no choice but to participate in the scheme: Defendant argued that it was implied to Defendant "that if he did not do at least one (1) (and then another) money laundering transaction his life would be in danger." (*Id.* at 14). Defendant also argued that in her August meeting with Diaz, Sandoval suggested real estate transactions specifically to entice Diaz to recruit Defendant, knowing that Defendant had real estate experience. (*Id.* at 7).

At trial, Defendant attempted to elicit from Sandoval facts to support his lack of predisposition. Counsel asked if Sandoval knew that Defendant's criminal history was checked by law enforcement, a fact she denied, explaining that it was not one of her duties as an undercover (ECF No. 217-36 at 30:18–20); *see also* (*id.* at 44:17–19) ("[Y]ou don't check to see if the target has a criminal history? A: I did not."). Rather, the agent explained her job as an undercover: "and I do numerous undercovers all over the country—so, when I do speak to the case agent, it is usually when I get assigned to an undercover operation. And, basically, it is What do I need to do? What are the objectives? And, that's pretty much it." (*Id.* at 31:17–22). Sandoval admitted that Defendant's criminal history report would have been included in the operational plan provided to her at the time that she met him, in October, but denied recalling what his criminal history was. (*Id.* at 45:17–25, 46:1–10).

The Government elicited additional testimony regarding Sandoval's role as an undercover on rebuttal; specifically, how it was possible that she was "not informed of every single detail of

---

[6] This is a reference to the standard articulated in *United States v. Mayweather*, 991 F.3d 1163, 1177 (11th Cir. 2021) ("Inducement involves more than a government-created criminal opportunity; it 'requires an element of persuasion or mild coercion . . . [I]nducement consists of opportunity plus something like excessive pressure or manipulation of a non-criminal motive.'") (quoting *United States v. Brown*, 43 F.3d 618, 623 (11th Cir. 1995) (alterations in original).

every aspect of this investigation as the undercover in the case?" Sandoval explained that she had "many undercover operations going on at all times" and that the "investigative process of a case is for the case agents that are working that case." Finally, she stated that her "job is only to do the undercover operations" and confirmed that agents give her "whatever information is necessary" for her to do her part of the operation. (*Id.* at 49:90–25, 50:1).

After the Government's case in chief, Defendant moved the District Court for a Judgment of Acquittal under Federal Rule of Criminal Procedure 29.   (ECF No. 217-38 at 2:17–19). Defendant's Rule 29 Motion was based on the theory that the CI's threats induced him to participate at least one transaction. Defendant argued that, in light of threats and coercion exerted by the CI, he could not have voluntarily and knowingly joined a conspiracy to commit criminal conduct. (ECF No. 217-38 at 3:18–20).  The Court considered that, despite defense counsel's cross-examination of Diaz, there was "no evidence that those threats were communicated back to the Defendant," (*id.* at 6:4–6), and that despite the call log evidencing a call between him and Defendant, Diaz testified that he never communicated the comments to Defendant (*id.* at 6:21–25).  The Court also described a "temporal attenuation" between the CI's involvement in July and Defendant's later participation in the December and January transactions with the undercover agent without the involvement of the CI. (*Id.* at 7:4–12). Essentially, the evidence showed that over the five months between his initial exit and the December and January transactions, Defendant could have backed out, but did not. (*Id.* at 7:13–19). The District Court denied the Rule 29 Motion. (*Id.* at 8:18).

The Government argued to the jury in closing that Defendant showed up to the meeting with Sandoval with the intention of making money. Sandoval, it was argued, did not know who Defendant was and was "not a part of the investigative team. She is someone that they use in the investigation." (ECF No. 217-37 at 12:13–14). The Government argued that, before the CI levied

his threats, Defendant had already expressed his willingness to commit the crime and that, without the CI's involvement from July forward, law enforcement did not do anything to induce him to come back in. (*Id.* at 13:8–23).

Defendant argued to the jury that without the CI's "involvement, without his threats, without his persuasion, without his constant urging . . . there would be no crime." (*Id.* at 17:5–9). The defense argued that the CI's threats dovetailed with Sandoval's first meeting with Defendant, in which she represented "the boss," expecting him to complete transactions following the CI's threats. (*Id.* at 31:13–15).

In its rebuttal closing the Government also argued that Defendant had multiple opportunities to back out before his meeting with Sandoval, after his meeting Sandoval, and in between transactions. *(Id.* at 36:1–10). Finally, Defendant's refusal to participate in the March and April transactions demonstrated that he was not acting out of fear and could have backed out sooner. (*Id.* at 39:18–22).

The Court instructed the jury on Defendant's theory of entrapment, which it explains

> occurs when law enforcement officers or others under their direction persuade a defendant to commit a crime that the defendant had no previous intent to commit . . . . [I]f there is a reasonable doubt about whether the Defendant was willing to commit the crime without the persuasion of a Government officer or a person under the Government's direction, then you must find the Defendant not guilty.

(ECF No. 124 at 17–18). Ultimately, the jury acquitted Defendant of the conspiracy count and one count of money laundering, and convicted him on the remaining charges (ECF No. 127).

## C.    The Motion For New Trial

In preparation for the sentencing hearing, defense counsel realized that although the Government had provided, as early *Jencks* material, text messages between the CI, the UC, and the co-defendants, it had not turned over any communications between case agent Munoz and special agent Sandoval. Counsel alerted the prosecutor to the apparent omission in Sandoval's

Jencks materials. The Government soon discovered that in fact, it had failed to turn over the text messages between the agents. In March of 2024, the Government provided Defendant with over 232 pages of messages between Agents Munoz and Sandoval, retrieved from Munoz's phone. The Government represented that the messages between the agents in Sandoval's phone had been deleted; the prosecutor proffered that Sandoval had deleted all messages she had with other agents, for security reasons. (ECF No. 193 at 10).

Upon review of the messages, Defendant formed the position that these were discoverable under *Brady* as well as *Jencks*, because their contents contradicted Sandoval's testimony that she had a limited role in the investigation. (ECF No. 189 at 5–6). Defendant moved to continue his sentencing and this Motion followed.

Defendant's Motion for a new trial argues that the withheld text messages between Munoz and Sandoval (a) impeach Sandoval's testimony regarding her low level of involvement in the investigation; (b) show that Defendant was specifically targeted by the investigation after he declined to participate in the scheme; and (c) provide potential impeachment material related to destruction of evidence. Specifically, Defendant argues that the newly discovered text messages between Munoz and Sandoval show regular communication, in contravention to Sandoval's sworn testimony regarding her limited involvement.  Defendant characterizes the evidence that Sandoval communicated with the case agent as *Brady/Giglio* material because he avers that they disprove her testimony about her limited role in the investigation. Defendant argues that the newly produced messages suggest the existence of other messages that have not been produced.

The Government responds that the material should not be characterized as *Jencks* or *Brady*, and argues Defendant has not shown that he was prejudiced. The Government further argues that, regardless, the newly produced messages were neither material nor prejudicial because they do not contradict Sandoval's testimony at trial.

### D.      The May 2, 2024 Hearing

The undersigned held an evidentiary hearing on May 2, 2024. Defendant called three witnesses: the prosecuting attorney, Assistant United States Attorney, Yara Dodin;[7] Agent Marisa Sandoval, and Agent Roberto Munoz.

### i.      AUSA Yara Dodin

AUSA Dodin testified regarding her pretrial process for collecting *Jencks* material. In advance of trial, the Government undertook to produce *Jencks* material early. Dodin requested discovery materials from case agents Munoz and Austin Mayberry. Dodin testified that she specifically described what types of documents she needed the agents to compile and did not rely on the agents' interpretation of the term "*Jencks*." However, Agent Munoz's collection was limited to his communications with the CI because the Government did not intend for Agent Munoz to testify.  Agent Munoz ultimately testified at trial only for the narrow purpose of rebutting an argument by Defendant that the CI pocketed money during the scheme.

Dodin also spoke with Sandoval before trial and requested any messages she may have had in her possession; Sandoval told Dodin that she had none to produce, but did not disclose her destruction of materials.

After trial, Dodin testified that when Defendant asked the Government for any messages between Sandoval and Munoz, she asked both Munoz and Sandoval for their materials. Dodin received screenshots from Munoz's phone, but when she requested messages from Sandoval's phone she learned then that they had been deleted. Dodin testified that she understood that Sandoval's practice was intended to preserve her safety and security while in the field. However,

---

[7] The Government objected and moved to quash the subpoena served on AUSA Dodin on relevance grounds. The objection and motion to quash were denied, on the finding that the Government's response to the Motion for new trial proffered facts, without evidentiary support, placing those facts at issue. Defendant offered to stipulate to certain facts to negate the need to call the prosecutor about those factual proffers, but the Government declined. Because the Government's Response relied on disputed facts proffered by the prosecutor, the relevance objection was overruled.

she counseled Sandoval regarding her obligation to maintain investigation-related communications.

### ii.   Agent Marisa Sandoval

Agent Sandoval is an undercover agent with the IRS. Although Agent Sandoval has been an undercover agent in some capacity since 2014, this was her first trial. Agent Sandoval testified that at the time she was investigating this case, her practice was to destroy messages from other agents on her undercover phone and keep messages from targets and CIs. She employed this system across all her cases with her undercover phone. She justified her decision by reasoning that at any point during an operation, a target could take her phone and look at her messages: while texts from other agents would destroy her cover, texts regarding purported illegal activity would boost her credibility in the field. Indeed, Sandoval testified that she has had a target ask to examine her phone in a different case. Agent Sandoval testified that she knows now that this practice is improper.

Sandoval also testified that she possessed very few messages from the CI on her undercover phone because she advised him to communicate with her solely through the case agent. She testified that she examined her undercover phone and confirmed that she had deleted all of her messages with agent Munoz.

Sandoval was also questioned regarding her review of any pre-operation plan. While no pre-operation plan was produced by the Government, Sandoval confirmed that she reviewed the single-page document, which was provided to her by supervisors, and essentially laid out how she should comport herself during the operation.

### iii.   Agent Roberto Munoz

Agent Roberto Munoz was the investigation lead agent during the period in which Defendant was a target. Agent Munoz testified that because he was not originally intended to be

a witness at the trial, he reasoned that he did not have *Jencks* material to provide the prosecutors when asked pretrial, outside of his messages with the CI, which were produced pretrial. Munoz was not aware of Agent Sandoval's practice of deleting messages until after the trial. At the prosecutor's request, Agent Munoz went through the messages on his government phone and personal cell phone to confirm what messages he exchanged with Agent Sandoval. Munoz produced to Dodin screenshots of all case-related messages he found on his government phone. He looked for but did not find case-related messages on his personal phone. He conducted the search himself and did not provide the prosecutor with his personal phone to review.

## II.    LEGAL STANDARD

The Court may, upon motion of the defendant, grant a new trial if the interest of justice so requires, or take additional testimony and enter a new judgment. Fed. R. Crim. P. 33(a). Defendant's Motion is predicated on violations of *Brady* and of the Jencks Act. Each has its own standard for evaluating whether the violation requires a new trial.

The Jencks Act requires the Court, on motion by the defendant, to order the United States to produce any statement of the witness in the possession of the United States which relates to the subject matter on which the witness has testified. 18 U.S.C. § 3500. The Act does not distinguish between statements that are beneficial to the defense and other material. *See United States v. Beasley*, 576 F.2d 626, 629 (5th Cir. 1978). Yet the government's failure to comply with the Jencks Act does not *per se* require a new trial. *See id.* (cited with approval by *United States v. Beasley*, 2 F.3d 1551 (11th Cir. 1993)). Defendant must also show that he was prejudiced. *United States v. Fonseca*, No. 22-13152, 2023 WL 7272320, at *5 (11th Cir. Nov. 3, 2023) (citing *United States v. Hamaker*, 455 F.3d 1316, 1327 (11th Cir. 2006)).

Because courts cannot speculate whether the *Jencks* material could have been effectively utilized at trial, the harmless-error doctrine must be strictly applied in Jencks Act cases. *Goldberg*

*v. United States*, 425 U.S. 94, 112 n. 21 (1976). The test then is whether the failure to produce the material had substantial influence on the outcome. *Beasley*, 576 F.2d at 629.

"A failure to produce Jencks Act material at trial . . . is harmless error where there is no 'substantial inconsistency, contradiction or variation' between the prior statements and the witness' trial testimony." *United States v. Keller*, 14 F.3d 1051, 1055 (5th Cir. 1994) (quoting *United States v. Merlino*, 595 F.2d 1016, 1019 (5th Cir.1979), *cert. denied*, 444 U.S. 1071 (1980)); *Beasley*, 2 F.3d at 1557 (finding harmless error in government's failure to turn over testifying DEA agent's report, which did not differ in any respect from agent's trial testimony).

> Flat contradiction between the witness' testimony and the version of the events given in his reports is not the only test of inconsistency. The omission from the reports of facts related at the trial, or a contrast in emphasis upon the same facts, even a different order of treatment, are also relevant to the cross-examining process of testing the credibility of a witness' trial testimony.
> *Jencks v. U.S.*, 353 U.S. 657, 667 (1957).

*Brady v. Maryland*, 373 U.S. 83, 83 (1963), and its progeny "require[] that the government disclose to the defense evidence exculpatory to the defendant." *United States v. Valera*, 845 F.2d 923, 926 (11th Cir. 1988). The Supreme Court held in *Brady* that "the suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." 373 U.S. at 87. *Brady* material draws no distinction between exculpatory and impeachment evidence. *Kyles v. Whitley*, 514 U.S. 419, 433 (1995).

In evaluating a Brady violation, the proper inquiry asks whether there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different. *See United States v. McLaughlin*, 279 Fed. App'x 856, 857 (11th Cir. 2008) (affirming denial of motion for new trial based on new evidence, which was consistent with trial testimony, thus no likelihood of changing the outcome of the proceedings). This does not require

14

demonstration by a preponderance that disclosure of the suppressed evidence would have ultimately resulted in the defendant's acquittal; nor is it a simple sufficiency of the evidence test. *United States v. Scheer*, 168 F.3d 445, 452 (11th Cir. 1999) (reversing conviction and ordering new trial where prosecutor's intimidation of "crucial" witness was withheld from defense).[8] Rather, the court must consider whether the suppression of the material undermines confidence in the trial. *See id.* (citing *Kyles*, 514 U.S. at 433).

To prevail on a motion for new trial based on a *Brady* violation, the Defendant must show that: "(1) the government possessed evidence favorable to him; (2) he did not possess the evidence and could not obtain it with reasonable diligence; (3) the government suppressed the evidence; and (4) if it had been disclosed, there is a reasonable probability that it would have changed the trial's outcome." *United States v. Sapp*, No. 21-14394, 2023 WL 2160134, at *4 (11th Cir. Feb. 22, 2023), *cert. denied*, 144 S. Ct. 252 (2023). A *Brady* violation requires that the nondisclosure "was so serious that there is a reasonable probability that the suppressed evidence would have produced a different verdict." Notably, the standard for *Jencks* Act violations is stricter than that for *Brady* violations. *See Beasley*, 576 F.2d at 630.

## III.    DISCUSSION

It is without any dispute that the text messages Sandoval sent to case agent Munoz in the course of the investigation are "statements" within the meaning of the Jencks Act. *See United States v. Suarez*, No. CRIM.A. 09-932, 2010 WL 4226524, at *5 (D.N.J. Oct. 21, 2010). The

---

[8] Defendant advances *United States v. Alzate*, 47 F.3d 1103 (11th Cir. 1995) to support his contention that the violation here was material and requires a new trial. The violation at issue in *Alzate* arose from prosecutor misconduct, specifically, failing to correct a material misstatement to the court and implicit misrepresentation to the jury. *Id.* at 1110. Accordingly, the court applied the "defense-friendly" standard articulated in *Napue/Giglio*: "if there is any reasonable likelihood that the false testimony could have affected the judgment of the jury." *Id.*. There is no comparable finding here of prosecutor misconduct, and the materiality standard applied in *Alzate* is inapplicable.

prosecutor acknowledged at the hearing that if she had received the messages from Sandoval pretrial, she would have turned them over to the defense as potential *Jencks* material.

The Government moreover concedes that some of the messages—three, to be precise— related to Sandoval's testimony but argues that, largely, the text messages are requests from one agent to the other for a phone call or relate to scheduling and accordingly, should not be characterized as *Jencks* material. Defendant misinterprets the Government's concession as also conceding that the suppressed messages constitute impeachment. Not so. Jencks Act statements are not limited to impeachment, but rather are defined by their relevance to the scope of testimony given by the witness.

On the concession that at least some of the withheld messages constitute *Jencks* material, I have considered Defendant's arguments and assessed whether Defendant was prejudiced by the failure to produce any or all of the messages at trial. *See United States v. Hamaker*, 455 F.3d 1316, 1327 (11th Cir. 2006) (affirming denial of motion for new trial, noting that the District Court's ruling was not limited to its determination that withheld documents were not *Brady* or Jencks Act material, but also on finding that defendant failed to show prejudice from the withheld documents).

Defendant argues that the suppressed messages would have been useful towards his entrapment defense insofar as they prove his theory that the Government used Sandoval to target Defendant after he refused to participate in the scheme with the CI, and they impeach Sandoval by showing that she had a much larger role in this case than she testified to. This latter point is not independently related to his defense, but Defendant challenges her minimization of her role because the Government's rebuttal of his entrapment defense argued this fact, in effect to show that she lacked even the opportunity to target Defendant to participate in the scheme.

The Court has undertaken to analyze Sandoval's testimony at trial and compare it against the messages produced after trial to evaluate whether Defendant was deprived of the opportunity

to cross-examine Sandoval on an "inconsistency, contradiction or variation" between the statements and her testimony that she played a limited role in the investigation, *see Keller*, 14 F.3d at 1055;[9] or explore the theory that she was working with the lead agent to secure Defendant as a target.  The Government elicited through Sandoval a number of facts to establish that she did not come to her first meeting with Diaz with a preconceived intent to induce Defendant's participation in the scheme. Sandoval testified that she did not know about Defendant or who he was until her meeting with Defendant and Diaz in October of 2022:

> Q. When you met the defendant on October 19th, 2022, had you ever met him before?
> A. I had not.
> Q. Did you know who he was?
> A. No, I did not.
> Q. Did you know his name?
> A. No.
> Q. Did you know anything about him?
> A. No.

(ECF No. 217-36 at 6:18–25, 7:1). Sandoval explained that she is only informed of a target before she meets with the case lead agent as part of her operational plan:

> Q. Right, I am asking you – so, when you get debriefed about this, right – because you are in this – at least June 7th, when you meet Yunier, right, you are the undercover agent from June 7th all the way to April 28th? It's you, right?
> A. Correct.
> Q. So, no one tells you about the targets?
> A. So, we do –
> Q. Yes or No?
> A. Well, Yes.
> Q. Okay

---

[9] Defendant Keller was convicted of wire fraud and conspiracy for his role in in a scheme to defraud cancer patients and their families by promising effective treatments for cancer. *Keller*, 14 F.3d at 1053. Keller defended the charges with evidence of the treatment's effectiveness, even testifying that he knew it would not cure but could extend the life of a cancer patient. *Id.* at 1054. At trial, the FBI agent testified that the "cure" rates of patients receiving the treatment was low, specifically that "78 or 79" of 103 patients had died within 2 years of receiving the treatment, and by the time of trial, 91 of those patients had died. *Id.* at 1055. His undisclosed grand jury testimony however stated that he had surveyed only 93 patients and approximately half of them (45) had died. *Id.* The court rejected the argument that the testimony conflicted with his trial testimony because he also disclosed to the grand jury that he had not updated his research, as he had by the time he testified at trial. *Id.* The court denied his motion for new trial, finding the error to turn over the grand jury testimony harmless; the denial was affirmed on appeal. *Id.* at 1056.

> A. Yes.
> Q. Go ahead.
> A. So, when we get assigned, there is an operational plan. And, whoever I am meeting with, there is like a picture and a criminal history, and, whoever I am meeting with, at that point.

(*Id.* at 45:5–20). Sandoval testified that in her August meeting with Diaz, her objective was to discuss two other targets referred to as "the casino guy" and "the Argentinean;" she reiterated that at that meeting, she did not know anything about Defendant.

> So, real estate was brought up because Jesus Diaz had named two individuals that were someone who we referred to as "the casino guy," and the other individual, who we referred to as "the Argentinean." And, at that point, when I went to the meeting on August 17th, I didn't know the defendant at all, or how he was involved in the case at all. So my – the two people that we had discussed on June 7th was the casino guy and an Argentinean guy. So, I wanted to get an update on what was going on with them . . . . So, my target for going into this meeting was the casino guy and the Argentinean guy.

(*Id.* at 35:25, 36:1–10, 36:17–18). Having testified that she did not know about Defendant before meeting him, the Government elicited testimony about her usual role in investigations to show that this was not out of her usual practice:

> Q. . . . How is it that you are not informed of every single detail of every aspect of this investigation as the undercover in the case?
> A. Like I said, I have many undercover operations going on at all times. The investigative process of a case is for the case agents that are working that case. My job is only to do the undercover operations. And, there are times that I call agents and get an update. That is usually when I am going to do another operation; that way, you know, I am informed, going in person, what I am going to be doing. But I don't get updated on all the cases that I am working all over the country.
> Q. Okay, so, basically, you show up when you are asked to show up for these undercover operations, right?
> A. That's correct.
> Q. And, the agents give you whatever information is necessary for you to do that part of the operation?
> A. That's correct.
> Q. Okay. So, it was not strange or weird that you didn't know who this person was, "this person" being the defendant, before you showed up on October 19, 2022.
> A: That's correct.

(ECF No. 217-36 at 49:8–25, 50:1–5).

Defendant argues that the withheld messages indicate that not only was Sandoval aware of Defendant, but she was coordinating with Agent Munoz to induce his participation. Defendant argues that as early as August 1, 2022, Munoz asked Sandoval "[c]an I call you later?" (ECF No. 189 at 10). Defendant notes that Munoz's request for a call occurred a week before Sandoval's first direct message to Diaz, on August 8, in which she inquired about opening an LLC to use for the transactions. Defendant also sets this exchange against the backdrop of the CI's threats levied against Defendant through Diaz between July and August. Defendant submits that the messages indicate that, in reaction to the CI's threats being ineffective to induce Defendant, Munoz contacted the undercover on August 1, 2022, to strategize a better way to induce Defendant. Another withheld message shows that on August 16, 2022—the day before Sandoval's meeting with Diaz—Munoz asked Sandoval to call him later. Defendant argues that, collectively, these messages support the conclusion that Munoz must have told Sandoval that Defendant was the target, rather than the "Argentinean" or "Casino guy," contrary to her testimony. *See* (ECF No. 217-36 at 36:17–18).

First, it bears noting that, to the extent Defendant's argument depends on Munoz contacting Sandoval to enlist her in his efforts to induce Defendant, he is misreading the text messages. The requests for phone calls actually came from Sandoval, not the other way around. Screenshots produced from Munoz's phone show that these two messages planning phone calls were incoming messages from Sandoval. *See* (ECF No. 218-1 at 1). Defendant's proposed inference, that the text messages evidence the moment that Munoz elected to bring Sandoval into a dialogue about Gomez, is not supported by the text messages.

The withheld messages do however support the inference that the agents spoke on the dates memorialized in the text messages. Defendant argues that the agents devised a plan to target Defendant by suggesting a plan that involved real estate because, at that time, Defendant was the

only potential target known to have real estate experience. With the withheld messages that showed regular contact between case agent and Sandoval in hand, Defendant argues he could have impeached Sandoval's testimony that she knew nothing about Defendant before the meeting, and by discrediting her testimony, he would have established that she intentionally targeted him for participation in a crime he declined.

The withheld messages do not contradict Sandoval's testimony that she was not aware of Defendant's identity until shortly before her first meeting with him in October. Moreover, newly produced evidence of her conversations with Munoz[10] is consistent with her testimony that she would speak with the agents and receive updates before and during investigations. (ECF No. 217-36 at 49:8–20) ("[T]here are times that I call agents and get an update . . . that way, you know, I am informed."). Because there is no contradiction between her testimony and these messages, they were of minimal impeachment value and their nondisclosure was harmless. *See United States v. Jones*, 601 F.3d 1247, 1266 (11th Cir. 2010) (affirming denial of motion for new trial based on *Jencks* violation where withheld statement by testifying witness did not contradict his trial testimony).

Defendant argues too that the withheld evidence supports his theory that the agents knew he was hesitant to complete the crime but nonetheless pushed him to do so. Government argues that  this is demonstrated by an exchange between the agents, following Sandoval's receipt of a message from Diaz, in which Diaz asks if there was an update on his proposed guy (Defendant). A suppressed message reveals that Sandoval had forwarded a screenshot of the exchange to Munoz. Munoz replied, suggesting that they speak the next day. (ECF No. 218-1 at 24). Defendant

---

[10] Defendant relies generally on messages between Munoz and Sandoval scheduling calls and meetings. These messages include, "let me know when you have a minute to talk," (ECF No. 218-1 at 37); (*id.* at 123), "[p]re-op call is at 11," (*id.* at 139), "is the meeting *como lo hacen* still on the 1st? Around 11 am?," (*id.* at 201), and "[c]an you give me a call when available please," (*id.* at 203).

submits that this message reveals hesitation on the part of both agents, implying that they both knew that entrapment may be an issue and they needed time to strategize how to avoid the defense. (ECF No. 189 at 13). This is pure speculation; nothing in the message or its timing allows the undersigned to reach so far to find support for Defendant's argument.

Another example he advances relates to evidence that he delayed completing the first transaction. After meeting with Sandoval for the first cash pick-up, Diaz advised Sandoval (in a messaged produced pretrial) that Defendant was delayed in completing the transaction because Defendant's father was in the hospital recovering from a stroke. Sandoval testified at trial about this proffered excuse:

> Q. And then on December 15th, you get a message from Mr. Diaz that Mr. Gomez's father is in the hospital with a stroke; correct?
> A: That's correct.
> Q. Okay. Now, you have no idea if that's true; correct?
> A. I do not.
> Q. And your response to that is, "I understand things happen, but, when people promise me something, they better follow through with it," something like that?
> A: That's correct.
> Q. And, you are essentially saying, "Hey, you better deliver on your promise because I work for this drug trafficking cartel," right?
> A. That's not what I said. But, what I did say is when someone tells me they are going to do something, I expect it to be done.

(ECF No. 217-36 at 41:12–25, 42:1–4).

A suppressed message reveals that Sandoval asked Munoz if he believed the story. (ECF No. 218-1 at 106). Munoz responded, "[n]o, but we have little choice. I don't think he will not pay us. We will give him til Monday the latest." (*Id*.). Defendant contends that Sandoval and Munoz's discussion about his excuse for not completing the transactions, and suspicion that he blamed his father's stroke, reveals their doubt about his hesitation to go through with the crime. (ECF No. 189 at 14). This is neither new nor contrary to the evidence adduced at trial. The fact that Defendant delayed the transaction on the representation that his father had a stroke was established at trial

and was grounds for cross-examination of Sandoval. *See* (ECF No. 217-36 at 41:12–17) (testifying that she did not know whether Defendant's father was actually in the hospital with a stroke). The new messages are merely cumulative because Defendant could have cross-examined Sandoval on whether she believed the veracity of his excuse for delaying the transaction—even beyond that which he did without the new messages. The failure to produce these messages was harmless. *See United States v. Fonseca*, No. 22-13152, 2023 WL 7272320, at *5 (11th Cir. Nov. 3, 2023) (affirming denial of motion for new trial predicated on Government's failure to produce grand jury testimony of testifying agent, which constituted Jencks Act violation but harmless).

Defendant argues that the withheld messages contradict Sandoval's characterization of her role in the investigation as minimal. Defense counsel explored the extent of Sandoval's role in the investigation, including the fact that she did communicate with the case agent:

> Q. Okay. And so did you either speak with the case agents, the IRS case agents about this case?
> A. My job as an undercover – and I do numerous undercovers all over the country – so, when I do speak to the case agent, it is usually when I get assigned to an undercover operation. And, basically, it is What do I need to do? What are the objectives? And, that's pretty much it.
> Q. So, did you talk to the case agents on this case?
> A. Yes, I did.

(ECF No. 217-36 at 31:15–24); *see also* (*id.* at 33: 23–25; 34:1–2) ("Q. Correct, because you were in communication with the case agent? A. Correct. Q. Who was updating you on this case? A. Yeah. Well, yeah.").

Defendant argues that the withheld messages reveal the true extent of Sandoval's involvement in the investigation of this case. (ECF No. 189 at 20). The suppressed messages reveal that Sandoval forwarded to Munoz screenshots of messages she received from Diaz, and he instructed her on how to respond. For example, Diaz messaged her how much cash would need to be transferred, which Sandoval forwarded to Munoz, who in turn responded "$100k"; Sandoval

replied to Diaz with that figure. (ECF No. 218-1 at 79). Diaz similarly asked about the commission percentage they had agreed upon, a question she again forwarded to Munoz. Munoz responded "[w]as it 8 or 10? … Yunier is 12 but that is high so say 8 and see what comes back[.]" Sandoval replied, "I think we said 10 for cash and 8 for wires[,]" (*id.* at 81). Munoz agreed, that "sounds . . . right." (ECF No. 218-1 at 81).

Defense counsel argued that this exchange characterizes Sandoval as "obviously not someone that is <u>not</u> involved in the investigation." The Government submits that the suppressed message merely reiterates the recorded meeting that took place between Sandoval, Diaz, and Defendant in October. (ECF No. 217-14 at 43).

First, these suppressed statements do not contradict any trial testimony. Nor do they reveal a level of participation in the investigation by Sandoval greater (or different) than she described at trial. Defendant's argument here is not especially clear but is premised on the fact that Sandoval supplied an answer that Munoz could not; but the recorded conversation that was admitted in evidence shows that her response merely repeats a fact established at the meeting. She did not, as Defendant's argument seems to suggest, propose an answer or direct the investigation through these messages. Defendant has not carried his burden of showing how non-disclosure of this message would have had a "substantial influence" on the jury. *Beasley*, 576 F.2d at 629 (quoting *Kotteakos v. U.S.*, 328 U.S. 750, 764 (1946)).

The suppressed statements in *Beasley* are distinguishable from the suppressed statements at issue. The court in *Beasley* granted a new trial where the defendant received evidence of a witness's interview that directly contradicted the witness's testimony. *See id.* at 633. The court compared the witness's testimony against a recorded interview and noted several material inconsistencies. *Id.* The court reasoned that the extent of the discrepancies would have furnished "further ammunition for the defendant's attack." *Id.* The withheld messages here do not similarly

contradict Sandoval's testimony, indirectly or by omission, regarding anything she did or did not do in this investigation. Her description of her usual role as an undercover agent did not imply, as Defendant now argues, that she had no communications with the case agent about the investigation. Indeed, she testified that she did speak to the case agents throughout the investigation. Any error relating to the suppression of this category of messages was harmless.

Defendant argues that another suppressed message would have impeached Sandoval's minimization of her role on the investigation team. In late March of 2023, after Defendant had participated in the last of the transactions he would engage in, Sandoval messaged Diaz with another opportunity to launder funds. Diaz responded that Defendant passed on the opportunity and Diaz suggested that it could be done with somebody else. Newly produced messages reveal that Sandoval forwarded to Munoz a screenshot of Diaz's suggestion. Munoz responded that he would think about it, but was leaning towards yes. (ECF No. 218-1 at 191). Sandoval replied that they could "pretend like [they] used someone else and then circle back in a couple weeks . . . to get Otho numbers up." (*Id.*). Defendant argues that this message goes to the crux of his entrapment defense: "the undercover agent was not only in on the plan to induce [him] to launder money after he said no[,] she helped the lead agent strategize the plan." (ECF No. 189 at 15). The Government responds that by March of 2023, all meetings and transactions committed with Defendant were completed, so any efforts at that point to induce his participation were irrelevant to his motivation earlier; to the extent this shows Sandovl did attempt to induce him to commit further crimes, those efforts moreover were unsuccessful. (ECF No. 193 at 16). Defendant replies that he could not link Sandoval to the inducement absent these messages. (ECF No. 197 at 7).

While the Government is correct that this message post-dates the substantive transactions for which Defendant was tried and convicted, the Court understands Defendant's argument to be that this message is representative of Sandoval's overall dynamic within the investigation.

Defendant argues that this message casts doubt over the Government's argument that Sandoval came into the investigation uncorrupted by the potential entrapment that predated her.

It cannot be meaningfully disputed that the withheld message was related to Sandoval's trial testimony, or that it was error not to have disclosed the message before Sandoval's cross examination. The salient inquiry now is whether the failure to produce the statement at trial results in a harmless error, or whether it mandates a new trial.

Defendant argues that "a Jencks error should be deemed harmless, and the defendant's conviction reinstated, *only if the district court found on remand that the defendant already possessed the information contained in the improperly withheld Jencks material.*" (ECF No. 189 at 18) (emphasis in original) (citing *Killian v. United States*, 368 U.S. 231, 244 (1961)). The withheld evidence at issue here does not reveal any new fact or event that occurred; the messages do not, for example, reveal that Sandoval initiated a contact with Defendant not previously disclosed, or communicated any form of enticement not previously known to the defense. Nor is the message inconsistent or contradictory to any testimony she gave at trial. *See Keller*, 14 F.3d at 1055. The withheld message relates only to impeachment of Sandoval as a witness, as distinguished from being direct, exculpatory evidence that supports Defendant's entrapment defense. *See United States v. Snipes*, 751 F. Supp. 2d 1279, 1288 (M.D. Fla. 2010), *aff'd*, 440 Fed. App'x 709 (11th Cir. 2011); *United States v. Diaz*, 190 F.3d 1247, 1255 (11th Cir. 1999) (denying motion for new trial based on newly-discovered sworn statement by co-conspirator, which was solely relevant to impeachment, finding it would not "probably produce an acquittal"). Accordingly, the Government's failure to disclose the message in violation of Jencks resulted here in harmless error.

As part of his theory that Sandoval targeted Defendant despite her knowledge that he had no prior criminal history, he asked her to admit at trial that she had run his criminal history:

Q. And, by the way, you know that Mr. Gomez's criminal history was ran in this case, correct?
A. I don't know that. That's not part of my duties.
Q. So, you have no idea that before January 11th, his criminal history was ran on January 4th?
A. No.

(ECF No. 217-36 at 30:18-23); *see also* (*id.* at 44: 17–19) ("[Q.] But, you don't check to see if the target has a criminal history? A. I did not.").

A suppressed message reveals that on December 19, 2022, Sandoval asked Munoz for Defendant's full name. (ECF No. 218-1 at 118). Munoz responded with Defendant's first and last name, stating that he could not recall his middle name. (*Id.* at 119). The Defendant avers that Sandoval's request for Defendant's full name supports the inference that she was the one who ran a criminal background search on Defendant in January. (ECF No. 189 at 15). Defendant argues that this Court may "speculate as to what conclusions could be drawn from the suppressed evidence." (ECF No. 197 at 7) (citing *Guzman v. Sec'y, Dep't of Corr.*, 663 F.3d 1336, 1348 (11th Cir. 2011)). In *Guzman*, the Eleventh Circuit considered a *Giglio* challenge based on evidence that reward payments to a witness had been suppressed. *Guzman*, 663 F.3d at 1348. The court considered the impeachment that could have taken place had defense counsel received the evidence of payment, including the witness's motivation to lie based on the timeline of the reward's publication and payment. *Id.*

There is a significant difference between withheld evidence that a thing occurred (payments made to a witness) and an ambiguous communication that could be argued to support an inference that a thing occurred. If the Government had withheld evidence that Sandoval ran the criminal history check, contrary to her denial at trial, *Guzman* would be analogous here. It is not. Even with the Court's speculation about how the material could have been used—short of determining

whether defense counsel would have done so effectively, which is forbidden, *see Goldberg*, 425 U.S. at 112 n.21—this message does not create a new line of impeachment or contradict Sandoval's prior testimony.

Ultimately, the failure to produce the statements violated the Jencks Act but did not controvert any evidence adduced at trial and thus had no substantial influence on the outcome. Otherwise, Defendant would have this Court read violations of the Jencks Act as an automatic new trial—a standard far stricter than required. Indeed, the Court's analysis "does not turn on reading the Jencks Act so literally as to be a per se rule that failure to produce a statement for any reason, however justified, requires a new trial absent certainty the error is harmless." *Beasley*, 576 F.2d at 630.

Nor does the failure to disclose the statements, or their deletion by Sandoval, warrant a new trial under the standard applicable to *Brady* violations. Defendant argues that the suppressed messages prove that he was entrapped or, at the very least, "the defense strategy would have certainly changed." (ECF No. 197 at 8). Taking Defendant's first argument first, the suppressed messages do *not* show that he was entrapped. Assuming for the sake of this argument that the text messages support his theory that Sandoval's influence over the investigation enabled her to target him, this does not show entrapment. Entrapment occurs when the Government does more than present an opportunity; entrapment is opportunity *plus* some additional government behavior that aims to pressure, manipulate or coerce a defendant into criminal activity. *United States v. Mayweather*, 991 F.3d 1163, 1178 (11th Cir. 2021) (noting the number of conversations the government agent had with the defendant (nine), coupled with defendant's hesitation during the first few calls, point towards inducement in finding that defendant had met the burden to establish entrapment defense). At most, Defendant argues that the contacts between the case agent and the undercover show the *opportunity* for the two agents to have discussed, and even conspired, to

27

entrap Defendant. But assuming the worst of the agents, and the most favorable inference Defendant would draw from the suppressed messages, they show nothing more than that; there is no new evidence that supports an inference that the agents applied pressure, manipulation or coercion, even if, as Defendant urges, they talked about doing it.

Defendant argues that Sandoval's appearance in this investigation in August 2022 proves that, contrary to the Court's finding at the Rule 29 argument, there was no cessation of Government inducement of Gomez; it merely passed from the CI to the UC. The withheld messages prove no such thing. Again, there remains an absence of contact *with Defendant* by either the CI or the UC; such contact occurred only by and through Diaz, or in recorded meetings with Sandoval. The withheld messages do not show—indeed Defendant does not even argue—contact by any Government agent after the CI ceased communication with him until his first meeting with Sandoval in October. Second, the withheld messages provide no revelation as to Sandoval's involvement in August; her communications with Diaz from early August were produced pretrial. Assuming for the sake of Defendant's argument that Munoz indeed contacted Sandoval a week prior for the purpose, as Defendant believes, of targeting Defendant, their ill intent would not undermine the Court's observation that no one from the Government contacted Defendant for months.

Defendant's second argument—that he certainly would have changed his defense strategy—is utterly unexplained, but supported by citation to *United States v. Spagnoulo*, 960 F.2d 990 (11th Cir. 1992). In *Spagnoulo*, the government suppressed a mental evaluation of the defendant, conducted in an unrelated prosecution; in reversing his conviction, the Eleventh Circuit found that the report was material because it could have fundamentally altered the defense's strategy and made an insanity defense a viable option. *Id.* at 995. Defendant's insistence that without the text messages, he lacked the ability to "link" agent Sandoval to the Government's

efforts to entrap him is belied by the fact that he in fact explored that defense theory in his cross examination of her at trial. To the extent he intends to argue now that the text messages would support a wholly different defense strategy than the one he pursued at trial, he has not developed the argument in this briefing and the undersigned cannot discern what else here was intended.[11]

Finally, Defendant argued that the Government's intentional destruction of the messages was itself a *Brady* violation that warrants a new trial. This is a multifaceted argument. I begin with my finding that there was no misconduct by the prosecutor; I credit her explanation that she explained to each agent, including Sandoval, the necessity of collecting and propounding to her any statements by the witness about the investigation, and find that she discharged her duty under the peculiar circumstances here (though a more thorough examination of the agents may have led her to ask Sandoval *why* she had no messages to produce). Next, it is without meaningful dispute that the Government had a duty to preserve the statements. Again, the prosecutor acknowledged at the hearing her understanding that she would have an obligation to disclose to the defense the fact that statements were deleted. In this case, though Sandoval deleted the messages from her phone, a copy resides on Munoz's phone. So, while her deletion of the messages from her own phone is certainly to blame for their suppression pretrial, the Government did not in fact destroy the messages between the agents.[12]

---

[11] In his Reply, Defendant argues that the Government's "distorted representation" of the evidence admitted at trial is "outrageous" and further supports his motion for a new trial. (ECF No. 197 at 2). The argument is not developed any further in the Reply, nor does the "Exhibit" attached to his Reply, which he describes as an "undisputed version" of the evidence, advance this argument for a new trial. "[A] litigant who fails to press a point by supporting it with pertinent authority, or by showing why it is sound despite a lack of supporting authority or in the face of contrary authority, forfeits the point. The court will not do his research for him." *Tursom v. United States*, No. 20-CV-20811, 2021 WL 1647888, at *2 n.2 (S.D. Fla. Apr. 27, 2021) (citing *Phillips v. Hillcrest Med. Ctr.*, 244 F.3d 790, 800 n.10 (10th Cir. 2001) and *McPherson v. Kelsey*, 125 F.3d 989, 995–96 (6th Cir. 1997) ("Issues adverted to in a perfunctory manner, unaccompanied by some effort at developed argumentation, are deemed waived")).

[12] Defendant's motion stops short of arguing a violation of due process for lost evidence under *Arizona v. Youngblood*, 488 U.S. 51 (1988). The *Youngblood* test would require Defendant to show that the lost evidence was "of such a nature that the defendant would be unable to obtain comparable evidence by other reasonably available means." *U.S. v. Pineda Castro*, 795 Fed. App'x 635, 653 (11th Cir. 2019) (quoting *United States. v. Brown*, 9 F.3d 907, 910 (11th Cir. 1993)) (internal quotation marks omitted). Here, the text messages ultimately were available through Agent Munoz's device.

Defendant advances in support of his motion *United States v. Newton*, 44 F.3d 913 (11th Cir. 1994), which is instructive. After trial, defense counsel discovered crime lab reports that contradicted the testimony of a government witness about the circumstances of a murder the witness attributed to the defendant; the undisclosed reports revealed that his testimony about those circumstances—including time of death, type of firearm used to kill the victim and proximity of the firearm to the victim—were all wrong. The reports would have impeached the witness's testimony about the murder. The Eleventh Circuit affirmed the trial court's denial of defendant's motion for new trial based on this *Brady* violation: "considering the entire record, we conclude that the omission was not material in the *Bagley* sense. Its suppression does not "'undermine confidence in the outcome of the trial.'" *Id.*, 44 F.3d at 919.

The Government's case-in-chief included eight witnesses (ECF Nos. 114, 115, 118), and Defendant presented three witnesses (ECF No. 122) over a five-day trial.  The jury heard testimony from the confidential informant and Diaz, in addition to the audio recordings of the meetings attended by Sandoval. Sandoval did not provide crucial evidence uniquely dependent on her or her credibility.  In the context of this record, the suppressed evidence that she deleted from her phone the messages between her and Munoz does not undermine confidence in the outcome of trial.

Defendant argues that the jury's mixed verdict supports the finding that the suppressed evidence would have made a difference in the outcome. Defendant identifies those questions asked by the jury during deliberations, including "why is count 13, 14, and 15 only on Diaz and Defendant and not on Cardenas;" "we can't come to a consensus on count 13, 14, and 15;" and "after vigorous and thorough debate, we are unable to reach a unanimous decision." *See* (ECF No. 126).  The Government submits that the Court cannot make conclusions about the jury's view of the case because the inconsistent verdict could be premised on mistake, compromise or lenity.

To the extent Defendant would have this Court speculate about the jury's reasoning in acquitting Defendant for some counts, while convicting him of others, such analysis is outside the Court's purview here. Any inconsistency may be explained by a variety of hypothetical circumstances, some of which may be antithetical to Defendant's theory presented here. *See United States v. Johnson*, 889 F.2d 1032, 1035 (11th Cir. 1989) ("Seemingly inconsistent verdicts can be explained in many ways including the jury's feelings of leniency. Our review is limited to whether the evidence is sufficient to support the guilty verdict."). Ultimately the evidence does not create a reasonable probability that the outcome would have changed here.

## IV.    RECOMMENDATION

Based on the foregoing, it is my **RECOMMENDATION** that Defendant's Motion for New Trial (ECF No. 189) be **DENIED**.

A party shall serve and file written objections, if any, to this Report and Recommendation with the Honorable K. Michael Moore, United States District Court Judge for the Southern District of Florida, within **FOURTEEN (14) DAYS** of being served with a copy of this Report and Recommendation. Failure to timely file objections will bar a *de novo* determination by the District Judge of anything in this recommendation and shall constitute a waiver of a party's "right to challenge on appeal the district court's order based on unobjected-to factual and legal conclusions." 11th Cir. R. 3-1 (2016); 28 U.S.C. § 636(b)(1)(C); *see also Harrigan v. Metro-Dade Police Dep't Station #4*, 977 F.3d 1185, 1191–92 (11th Cir. 2020).

**RESPECTFULLY SUBMITTED** in Chambers in Miami, Florida, this 11th day of October, 2024.

LAUREN F. LOUIS
UNITED STATES MAGISTRATE JUDGE